## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:14-CR-293-TCB/AJB** |
| **CHARLES BASKIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER
## AND FINAL REPORT AND RECOMMENDATION

Defendant Charles Baskin is charged in a three-count indictment with possession with intent to distribute cocaine (Count One), possession of a firearm in furtherance of a drug trafficking crime (Count Two), and possession of a firearm that affected commerce after having been convicted of a felony (Count Three), arising out of the stop and search of a vehicle he was operating on October 13, 2013.  [Doc. 1].  He moved to suppress evidence, [Doc. 13], and statements, [Doc. 14].  The Court held an evidentiary hearing, [Doc. 25 (hereinafter "T__")], after which the parties filed briefs.  [Docs. 26

(Govt.), 27 (Baskin)].[1,2]  For the following reasons, the undersigned **RECOMMENDS**

that the motions be **DENIED**.

## I.   Facts

On October 10, 2013, ATF Special Agents Allan McLeod and Gabriel Brooks

were using a confidential source ("CS")[3] to attempt to purchase cocaine from Baskin.

T6-7.  In the days leading up to the transaction, through Facebook, the CS ordered two

ounces of cocaine from Baskin for $2,000, based on an amount of cocaine suggested

by the agents.  T7, 19, 20, 27-28.  The agents also viewed Baskin's Facebook page.

T19.  On the day of the transaction, the CS telephoned the agents and advised them that

Baskin was at the agreed-upon location to conduct the sale, the BP station on Ralph

---

[1]      The Court stayed ruling on the motions pending a transfer of Defendant's case to the Eastern District of Tennessee pursuant to pursuant Fed. R. Crim. P. 20, [Doc. 29], and subsequently deemed the motions withdrawn.  [Doc. 30].  The case was reopened and re-referred to the undersigned for a recommended ruling on the motions.  [Doc. 41].

[2]      At the evidentiary hearing, the Government announced that it was not going to use any of Baskin's statements at trial.  T3.  Accordingly, the undersigned **RECOMMENDS** that Baskin's motion to suppress statements, [Doc. 13], be **DENIED AS MOOT**.

[3]      ATF Special Agent McLeod had used the CS since July 2013.  He testified that the CS had proven reliable in that his information was verified and led to the arrest of multiple state and federal defendants.  T6, 17.  The CS also tried to set up some deals where the suspected sellers did not show up.  T17-18.

2

David Abernathy Boulevard ("RDA") off of the I-75/I-85 Connector; this location was chosen because the CS did not have a car and was within walking distance to his home. The CS also described the vehicle Baskin would be driving. T7-8, 20, 28-29. About thirty minutes before the deal was to occur, the agents met with and searched the CS to make sure he did not have any contraband or currency on him, but then the CS was allowed to walk back to his home a few hundred yards away. T18-19.

Agents Brooks and McLeod then drove to the BP station and pulled in at the gas pumps behind Baskin's vehicle, a rented, black Dodge Charger. T8, 11.[4] Brooks recognized Baskin from photographs. T9. Brooks already had an open file on Baskin, which included a search warrant at a location associated with Baskin, resulting in the seizure of contraband. T7.[5] A female also was observed in Baskin's vehicle. T9, 20.[6]

---

[4] The car was rented to Kenny Hill, but Baskin was listed as a secondary driver. T16.

[5] Brooks also had information that Baskin was known as a drug trafficker in numerous states. T7. Because this information is too general and conclusory, the Court does not rely on it in deciding whether probable cause existed to stop Baskin's vehicle and arrest him. *Cf. Rivera v. Murphy*, 979 F.2d 259, 263-64 (1st Cir. 1992) (finding no probable cause for arrest when officer set forth no facts, but only made subjective and conclusory statement that based on his "observations, training, and experience" he had witnessed a drug transaction).

[6] The agents did not know that a third person was going to be at the deal until they saw her in the vehicle. T20.

3

The agents had arrived at the BP station before the CS.  T9.  Uniformed Atlanta Police Department ("APD") and other law enforcement officers also were alerted and present in the area.  T9.  The ATF agents were communicating with these officers.  T18.  The agents watched Baskin sitting in his vehicle at the gas pump for twenty minutes before the CS arrived.  T29.  The agents pumped gas into their car but did not see Baskin get out or put gas in his vehicle.  T29-30.

When the CS arrived, the agents saw the CS get into the back seat of Baskin's car.  T9, 21.  McLeod first testified that within minutes of the CS's arrival, while the CS was on the phone with the agents, the Charger left the gas station and pulled onto RDA, and the CS told the agents that he needed to get the money, which was the pre-arranged code to the agents that the CS had seen the cocaine; T10, 22, 30; a marked APD police car blue-lighted the Charger while it was on RDA, T31; and Baskin pulled his car into the parking lot of the shopping center across the street from the BP station, directly in front of the front door of the Museum Bar, where he and the female were arrested.  T10, 11, 23, 31.  However, after reviewing Brooks's report of the incident, McLeod testified that after the CS entered the Charger, the Charger drove off and the CS instructed Baskin to go across the street, one hundred to two hundred yards away, into the parking lot of the Museum Bar, where the CS called and stated to the agents

4

to bring the money, and at that point, the takedown signal was given.  T10, 33-34. Baskin and the female passenger, Ms. Perkins, were arrested.  T11.  Two ounces of cocaine in plastic bags were seen by the APD officers and McLeod in plain view on the right passenger floorboard.  T11, 23-24.

Because the vehicle was parked on private property and Baskin and Perkins were arrested, the vehicle was to be impounded and towed from the scene.  T12.  McLeod also testified that based on his training and experience he believed that other contraband would be located in the vehicle, since Baskin did not live near the BP station and likely would carry additional quantities of drugs for his other deliveries.  T13.  However, he acknowledged that he had no information that additional drugs would be in the vehicle. T24-25.[7]

The ATF impound policy provided that an impounded vehicle must be inventoried to protect the property and to protect the ATF from claims of damage and that, in conducting an inventory search, all compartments and containers in the vehicle

_____

[7]      McLeod denied that his training and experience would lead him to conclude that Baskin would be unlikely to have other drugs in his car due to a fear of being robbed.  T24.

5

must be opened and searched.  T13.[8]  Moreover, according to the APD impound policy,

when an arrested person's vehicle is not parked on his own property, or if the vehicle

contains suspected contraband, the vehicle is inventoried and then towed.  T14-15;

Gov't Exh. 1.  The APD policy also provided that during an inventory search, all

compartments, including the glove compartment and center console, are to be

searched.  T15.

In conducting an inventory search of the vehicle, a firearm was located in the

center console.  T25.  McLeod also testified that it was typical to find firearms during

drug transactions.  T27.

---

[8]     The document introduced as the ATF policy does not expressly state that all compartments must be opened.  Gov't Exh. 1 at 9 [Doc. 32-2 at 9].  It also does not appear to be a complete version of the ATF policy.  In any event, a standard procedure need not be written in order to be upheld as a valid inventory policy.  *United States v. Foskey*, 455 Fed. Appx. 884, 890 (11th Cir. Jan. 9, 2012) ("[T]he government need not show that a written policy, city ordinance, or state law supports the impoundment.") (citations omitted); *see also United States v. Hawkins*, 279 F.3d 83, 86 (1st Cir. 2002); *United States v. Skillern*, 947 F.2d 1268, 1275 (5th Cir. 1991); *United States v. Beckford*, No. 1:09-CR-263-TWT-GGB, 2010 WL 1487817, at *4 (N.D. Ga. Feb. 2, 2010) (R&R), *adopted in part*, No. CRIM.109-CR-263-TWT, 2010 WL 1489970 (N.D. Ga. Apr. 13, 2010), *aff'd sub nom. United States v. Haile*, 685 F.3d 1211 (11th Cir. 2012).

## II.    *Arguments of the Parties*

The Government argues that probable cause existed to stop and search the Charger.  [Doc. 26 at 5].  It contends that (1) Brooks already had executed a search warrant for contraband at a location associated with Baskin; (2) the agents were using an informant who had proven reliable in the past to set up a drug deal with Baskin; (3) the CS told the agents that Baskin had agreed to sell two ounces of cocaine for $2000, the deal would occur at the BP station that day, and Baskin would be driving a black Dodge Charger; (4) the agents went to the location and saw Baskin in a vehicle just as the CS described; (5) Baskin sat in the Charger for several minutes without exiting the vehicle or pumping gas into it; (6) the CS entered the vehicle and called the agents with the code indicating that he had seen the cocaine; and (7) after the Charger drove across the street, the police stopped it and observed the cocaine in plain view of the passenger floorboard.  [Doc. 26 at 6-7 & n.9].  The Government argues that taken all together, these circumstances justified the stop and search of the Charger and the arrest of the defendant.  It contends that these facts demonstrate that Baskin was engaging in drug dealing and that the events were consistent with the information conveyed to the agents by the CS.  [*Id.* at 7-8].

7

The Government next argues that the search of the vehicle was consistent with *Arizona v. Gant*, 556 U.S. 332 (2009), because the agents had reason to believe that additional drugs, money or firearms would be located in the vehicle based on what they knew about Baskin's activities, and McLeod's training and experience led him to believe that there were other quantities of drugs secreted in the vehicle. [Doc. 26 at 9-10 (citing *United States v. Brazel*, 102 F.3d 1120, 1146-47 (11th Cir. 1997) (finding probable cause to justify a warrantless search of the vehicle because circumstances indicated that the car was used to facilitate drug offenses)].

The Government also argues that the Charger was properly searched pursuant to standardized inventory protocols. [Doc. 26 at 10-12]. It contends that both the ATF and APD impound/inventory policies provided for impound if the driver was arrested and no one was present who was authorized and capable of removing the vehicle, and that neither policies required law enforcement to locate a third party to take custody of the vehicle. [*Id.* at 12-13 (citing Gov't Exh. 1)]. The Government also submits that law enforcement did not exceed the scope of the inventory policies because the policies authorized the opening of all compartments and containers. [*Id.* at 13 (citing Gov't Exh. 1)].

8

In response, Baskin argues that probable cause was lacking to stop his vehicle. He argues that the sole basis for the stop was the CS's statement that the drugs were there, however, Agent McLeod also testified that the CS previously provided information that Baskin characterizes as unreliable because the CS set up drug deals where the purported sellers did not appear.  [Doc. 27 at 3].  Therefore, he argues, the stop was only supported by speculation.  [*Id.*].

Baskin next argues that *Gant* does not support the search of the vehicle because, first, Baskin already was secured and thus had no access to the vehicle, and second, the agents did not have reason to believe that additional contraband or evidence would found in the Charger.  He contends that the only evidence that more contraband would be located in the vehicle was McLeod's bare belief that in his training and experience, Baskin "might have more" drugs if he was making more deliveries, a standard lower than *Gant*'s "reason to believe."  [*Id.* at 4-6 (citing T24)].  He argues that in order for a *Gant* search to properly be undertaken, there must be evidentiary support and not mere speculation.  [*Id.* at 6].  Finally, he points out that the officers found the cocaine that was the subject of the deal in plain view, conceding that if the drugs were not visible, then a search of the vehicle would have been permissible.  He contends that since law enforcement in fact located the two ounces of cocaine that the CS was

arranging to buy, there was no reason to search for any additional cocaine, and, in any event there was no further exigency; thus, he submits, the vehicle could not be searched without a warrant.  [*Id.* at 6-7].

As for the inventory-search rationale, Baskin argues that the vehicle was on private property, not blocking traffic, there was no request from the property owners to remove the vehicle, and thus was not properly subject to an inventory search.  [*Id.* at 9-10].  He relies upon *United States v. Pappas*, 735 F.2d 1232, 1234 (10th Cir. 1984), for the proposition that the mere fact that the vehicle's owner is arrested on private property does not justify an impound and inventory search. [*Id.* at 10-11].

The Government did not file a reply brief.  (*See* Dkt.).

## III.   Discussion

### A.   *Stop of the Charger, Baskin's Arrest, and Seizure of Cocaine*

The Court concludes that there was probable cause to stop the Charger and arrest Baskin.

"The question of what amounts to probable cause is purely a question of law. . . ."  *United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (citations and internal quotation marks omitted).  Under the Fourth Amendment,

10

individuals are protected from unreasonable searches and seizures by the government. *Terry v. Ohio*, 392 U.S. 1, 8 (1968). "This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." *California v. Carney*, 471 U.S. 386, 390 (1985). "However, the search and seizure of vehicles without a warrant is permissible when the police have probable cause to believe a vehicle contains contraband." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007).

When a confidential informant has provided information that contributes to a subjective belief by law enforcement officers that they had probable cause to make an arrest, the reviewing court may not accept that subjective determination but must make an objective determination of whether probable cause to make an arrest existed at the time of the arrest in light of the totality of the circumstances; including whether: the informant's information was based on personal knowledge; he had a history of providing reliable information, and the information provided by the informant was corroborated by independent police work. *See Illinois v. Gates*, 462 U.S. 213, 225-41 (1983); *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996).

Probable cause to make a warrantless arrest exists when, at the moment of arrest, the facts and circumstances within the collective knowledge of the officers involved are

sufficient to cause a prudent person to believe that a defendant has committed, is committing, or was about to commit an offense. *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979); *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir. 1983); *see also Virden*, 488 F.3d at 1322 ("Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found.") (quotations omitted).

"In determining whether an informant's tip rises to the level of probable cause, [courts] assess the totality of the circumstances." *Ortega*, 85 F.3d at 1525 (citations omitted). "[Courts] consider the relevance of factors such as the informant's 'veracity,' 'reliability,' and 'basis of knowledge.' " *Id.* (citations omitted). "In addition, the corroboration of the details of an informant's tip through independent police work adds significant value to the probable cause analysis." *Id.* (citations omitted). The main question is whether the tip "exhibited sufficient indicia of reliability" to justify the subsequent . . . arrest. *United States v. Gibson*, 64 F.3d 617, 620 (11th Cir. 1995) (citing *Alabama v. White*, 496 U.S. 325, 332 (1990)).

Under the totality of the circumstances, the Court finds that the officers had probable cause to stop the Charger and conduct a warrantless arrest of Baskin. The ATF agents were utilizing a CS whose information in the past had led to arrests of federal and state defendants. That on occasion the CS arranged for a deal that was

12

unsuccessful because the seller did not show up does not render the CS's information unreliable. *Cf. United States v. Akins*, No. 4:07-CR-48 CAS, 2007 WL 1018761, at *6 n.2 (E.D. Mo. Apr. 2, 2007) (holding that search warrant was not invalid where affiant averred that he had used reliable informant on numerous occasions that led to at least three arrests for narcotics violations; "[t]he affidavit does not state nor should it be read to mean that on occasions when arrests did not occur that the informant's information was not reliable"). There is no evidence, for example, that the CS reported to law enforcement that there were drugs present when in fact there were no drugs, or that persons were arrested based on false or incorrect information provided by the CS.

More importantly, two pieces of information from the CS rendered the information about Baskin reliable. First, the CS gave detailed information about the time and location of the deal and the vehicle Baskin was driving, and these facts were verified by independent police investigation. It is true that a tip that relays only presently observable facts "might not be sufficient in and of [itself] to lend the necessary credence to the informant's tip to create a reasonable suspicion of drug trafficking." *United States v. Brown*, 636 Fed. Appx. 514, 519 (11th Cir. Jan. 11, 2016) (quoting *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995)). Significantly, however, the agents observed Baskin sitting for some time in the described vehicle at

13

the gas pumps without exiting the vehicle or pumping gas, lending credence to the CS's information that Baskin was waiting on the CS to arrive to conduct a drug deal.  *See United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) (holding that informant's reliability may be demonstrated through independent police corroboration of information provided); *see also Gates*, 462 U.S. at 244 ("Because an informant is right about some things, he is more probably right about other facts . . .") (quoting *Spinelli v. United States*, 393 U.S. 410, 427 (1969) (White, J., concurring)).

Second, and more important, the CS reported to the agents that he had seen the cocaine.  *Brown*, 636 Fed. Appx. at 519 ("The tip also exhibited reliability because the informant personally witnessed Brown dealing drugs."); *United States v. Vazquez*, 406 Fed. Appx. 430, 431 (11th Cir. Dec. 28, 2010) (finding probable cause for arrest where "law enforcement officers had reasonably trustworthy information that would cause a prudent person to believe that Vazquez was committing a felony, based on information from a confidential informant, who had obtained cocaine previously from Vazquez and who personally observed cocaine in the floorboard of Vazquez's vehicle shortly before the arrest."); *United States v. Brundidge*, 170 F.3d 1350, 1352-53 (11th Cir. 1999) (holding that a stronger showing of an informant's basis of knowledge may make up for weakness in a showing of veracity); *United States v. Robinson*,

14

202 Fed. Appx. 434, 436 (11ᵗʰ Cir. Oct. 27, 2006) ("An 'explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles the [confidential informant's] tip to greater weight than might otherwise be the case.' ") (quoting *Brundidge*, 170 F.3d at 1353) (citations omitted in original); *see also United States v. Reyes*, 792 F.2d 536, 539 (5ᵗʰ Cir. 1986) (holding that "an informant's tip is buttressed [through] the fact that it is based on his own personal observation").

Therefore, law enforcement had probable cause to stop the Charger and arrest Baskin.  The cocaine was properly seized since it was in plain view.  *Horton v. California,* 496 U.S. 128, 136-137 (1990); *United States v. Hromada*, 49 F.3d 685, 690 (11ᵗʰ Cir. 1995).

### B.    *Further Search of the Charger Resulting in Seizure of Firearm*

As noted, the Government argues that the Charger was further searched and the firearm seized properly based on *Gant* and an inventory search.[9]

---

[9]    The Government did not argue that the search of the Charger was justified under the co-called "automobile exception" to the Warrant requirement of the Fourth Amendment.   The automobile exception allows officers to search any item or compartment in the car that might contain the object of the search without a warrant, as long as they have probable cause to believe that it holds evidence of a crime.  *United States v. Strickland*, 902 F.2d 937, 942 (11ᵗʰ Cir. 1990).  The automobile exception does not contain a separate exigency requirement.  *Maryland v. Dyson*, 527 U.S. 465,  466-

### 1. Gant

In *Gant*, the Court held that a search incident to arrest, following an automobile stop, is permissible if either (1) it is reasonable to believe that the arrestee might access the vehicle at the time of the search, or (2) if it was "reasonable to believe" that the car contained evidence of the offense of the arrest. *Gant*, 556 U.S. at 335. In this case, the Government did not present any evidence that Baskin could have gained access to the vehicle following his arrest, and so the Court evaluates whether the search of the vehicle was valid under *Gant*'s second prong. *Gant* provides that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (quotation omitted). In such a case, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* As to the vehicle exception, the *Gant* Court

---

67 (1999). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Id.* at 467 (quotation omitted). "[T]he requirement of exigent circumstances is satisfied by the 'ready mobility' inherent in all automobiles that reasonably appear to be capable of functioning." *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990). Since the Government did not raise it, the Court will not decide whether the automobile exception allowed the search of the Charger that led to the discovery of the firearm in the center console.

itself observed that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-[]21[ ] (1982), authorizes a search of any area of the vehicle in which the evidence might be found. . . . *Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." *Gant*, 556 U.S. at 347 (internal citations omitted).

Thus, independent of McLeod's belief that Baskin may have secreted additional drugs in the Charger, the fact that Baskin told the CS the type of vehicle he was going to use to deliver the cocaine, and then he arrived in that vehicle to deliver cocaine to the CS, provided a basis under *Gant* for law enforcement to search the vehicle for the presence of evidence (which may or may not include additional contraband) related to Baskin's distribution of a trafficking amount of cocaine to the CS in his vehicle. Therefore, the firearm was properly found and seized.[10]

------------------------------------------------------------

[10]  The Court also notes that Baskin's argument that McLeod had no reason to believe that additional drugs would be found in the Charger because in fact no additional quantities of drugs were found, is off the mark.  The validity of a search is not dependent upon what it reveals. *Bumper v. North Carolina*, 391 U.S. 543, 548 n. 10 (1968) (search not justified by what it turns up); *United States v. Di Re*, 332 U.S. 581, 595 (1948) ("We have had frequent occasion to point out that a search is not to be made legal by what it turns up. . . . In law it is good or bad when it starts and does not change character from its success.") (footnote omitted).  Consequently, a search is not invalidated simply because it results in no contraband or incriminating

### 2.    *Inventory Search*

Additionally and, if the District Judge concludes that the undersigned's *Gant* analysis is incorrect, alternatively, the Charger was properly searched pursuant to the inventory exception.  An inventory search conducted according to standardized criteria constitutes one of the well-defined exceptions to the probable cause and warrant requirements of the Fourth Amendment.  *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976).  To satisfy the so-called inventory search exception, the Government bears the burden to demonstrate that the officers possessed the authority to impound the vehicle and followed departmental policy in conducting the search.  *United States v. Witten*, No. 14-14692, 2016 WL 2803047, at *6 (11th Cir. May 13, 2016) (citing *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991)).  Thus, law enforcement may lawfully impound a vehicle when they have arrested its occupant—even if the vehicle is not impeding traffic or otherwise presenting a hazard—"so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity."  *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) (quoting *Bertine*, 479 U.S. at 375).  If the vehicle has been impounded

---

evidence being uncovered.

18

lawfully, an officer may conduct an inventory search, including a search of closed containers, " 'provided the search is conducted pursuant to standardized criteria.' " *Witten*, 2016 WL 2803047 at *6. Although inventory searches cannot serve as pretext, " 'the mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search.' " *Id.* (quoting *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982)). "An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory." *United States v. Khoury*, 901 F.2d 948, 958 (11th Cir. 1990) (citing *United States v. Laing*, 708 F.2d 1568, 1570 (11th Cir. 1983)).

In the present case, the APD impound policy provided, in relevant part, at § 4.13.6, that

A vehicle will be impounded if:

1. **The driver is arrested**, not qualified, not capable to drive the vehicle due to impairment, or not having a valid license, and:

   a. The operator refuses to release the vehicle to a person of his or her own choosing who is present and is properly qualified and capable of operating the vehicle, or **there is no such person present**.

19

b.   **The vehicle is not parked at his or her
residence or property.**

Gov't Exh. 1 at 4-5; [*see also* Doc. 32-2 at 4-5] (emphasis added).  In this case, the

vehicle was impounded properly because Baskin was arrested, there was no other

person to retrieve the vehicle, and the vehicle was not on Baskin's residence or

property.  It is irrelevant that the Charger was on private property when the private

property was not Baskin's.  As a result, *Pappas* is not helpful because the impound

policy in that case violated *Opperman*, since it authorized the impounding of a vehicle

solely based on the arrest of the driver, untethered from the community-caretaking

rationales underlying an inventory search, i.e., to protect the owner's property in police

custody, to protect the police against claims of lost or stolen property, and to protect the

police from potential danger.  *Pappas*, 735 F.2d at 1234.  In the present case, both the

APD and the ATF impound policies were based on law enforcement's community

caretaking functions.  APD: T14; ATF: Gov't Exh. 1 at 9 [Doc. 32-2 at 9] ("The

inventory search may be conducted only to protect the owner's property and to protect

ATF against potential claims and dangers and is part of the standard procedure and not

a pretext for an investigatory search.")].  Moreover, in *Pappas*, the court noted that the

defendant's friends were present and possibly able to secure the vehicle.  *Pappas*,

20

735 F.2d at 1234.  In the present case, there was no such person present since both Baskin and Perkins were arrested.  Neither impound/inventory policy in this case required that Baskin be afforded an opportunity to locate a person to take possession of the vehicle, and the Supreme Court has recognized that the Fourth Amendment is not violated merely by the police impounding a vehicle rather than permitting an arrestee to make alternative arrangements for the vehicle's disposition.  *See Bertine*, 479 U.S. at 373-74.

Finally, although not challenged by Baskin, the search of the center console resulting in the discovery of the firearm was well within the scope of the inventory search.  Gov't Exh. 1 at 6 ("When conducting an inventory search, the officer will search all compartments (passenger, engine, trunk, etc.)") [Doc. 32-2 at 6].  Therefore, the searching officers were authorized to open the center console and seize the firearm located therein.

## IV.    *Conclusion*

For all of the foregoing reasons, the undersigned **RECOMMENDS** that Baskin's motion to suppress evidence, [Doc. 13], be **DENIED**, and that his motion to suppress statements, [Doc. 14], be **DENIED AS MOOT**.

The Court has now disposed of all matters referred to it, and has not been advised

AO 72A
(Rev.8/82)

of any impediments to scheduling a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

　　　　**IT IS SO RECOMMENDED AND CERTIFIED**, this  24th  day of August, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

22